All right, we need to hear from Mr. Steklov. Good morning, may it please the court. There are two issues raised in this appeal. The first is whether the court improperly denied a motion to suppress a receipt for a purchase of a belt. The second is whether the court improperly admitted hearsay testimony of an unavailable co-defendant that was offered through a jailhouse informant. And I'd like to start by focusing on the second issue regarding the jailhouse informant. The jailhouse informant testimony raises concerns because, both hearsay concerns and confrontation concerns. And it does so because here the jailhouse informant was testifying regarding statements from an unavailable co-defendant. It's one thing for a jailhouse informant, well jailhouse informant testimony is sort of inherently reliable, but it's obviously a tool of the government, they use it in many cases. But it's one thing for a jailhouse informant to offer testimony made by a defendant. Well, how was it testimonial? Don't you have to first tell us that before you go on to your next step? Well, I think that's... Under Crawford and the cases following Crawford, don't you have to first tell us why it's testimonial as opposed to non-testimonial? I believe that that is still an open issue. In Crawford, and this argument is made most effectively, I believe, by the court in the Williams case that we cite, a district court case at unpublished. Let's stick with Crawford for a minute. Crawford talks about testimonial being whether the declarant would have expected that his statement would be used at trial, isn't it? Whether he would have expected or intended to bear witness against another person in a later proceeding. I think that's the language from Crawford? Yes, but what's... How is this statement from Harvey's statement to Schanenberger meet that definition? I concede that the statement from Harvey to Schanenberger was non-testimonial, but in Crawford, the court at pages 60 to 61 said that it was considering two issues. It said that they've been asked by members of this court and academics to consider two proposals. First, that we apply the confrontation clause only to testimonial statements. Second, that we impose an absolute bar to statements that are testimonial. Then the court goes on to say that in White v. Illinois, we considered the first proposal and rejected it. Although our analysis in this case casts doubt on that holding, we need not definitively resolve whether it survives our decision today. But cases have not extended Crawford beyond testimonial evidence. I mean, they've been careful to draw that line between testimonial and non-testimonial. I mean, there's just no way that Harvey's testimony could be considered non... I mean, could be considered testimonial. I mean, I don't... I concede that Harvey... The statement against interest is not likely to be testimonial. No, I concede that the statement... I absolutely concede that the statement by Harvey to... So you would agree that the requirements and the elements of 804B3 have been met? No, there are two separate issues. There's a confrontation clause issue... But initially, I thought there was an 804B3 challenge. There is an 804B3 challenge. So my question, before we get to the constitutional challenge, Schanenberger's testimony about Harvey's comment, you agree that Harvey was not available to testify? Yes, Your Honor. So that's one of the elements of 804B3. And you would agree that this was an incriminating statement against penal interest? Well, I wouldn't... So in Williamson v. United States, the Supreme Court held that the court has to parse the statements. And so you have to look at the totality of the statements themselves. And there may be inculpatory, self-inculpatory aspects of the statement, but there may be non-self-inculpatory aspects. You know, he's talking about this whole conspiracy, isn't he, to rob this Edward Arthur Jeweler's store. Yes, and what we argued... How could that not be a statement against penal interest? What we argued to the district court is that when you looked at the context, what he said was that he committed a robbery, he stole a bunch of watches, that they later pawned the watches and received money for them, and that he did it with two other people. He actually specifically identified the second co-defendant who also pled guilty. He then said, I did it with a third person, and that the third person, which was allegedly my client, was located at that time in the Howard County Detention Center. And what we're arguing is that that last portion, that the third person was at the Howard County Detention Center, was not self-inculpatory because it didn't expose him to any additional criminal liability. That third co-conspirator. But without identifying who the third co-conspirator was. Information that closes the loop on that. I mean, without that, arguably he's opened himself up with respect to charges for the robbery as a whole, but also to the conspiracy for the person he identified by name. But he's also inculpated himself with respect to this third person with an additional identifying factor for the acts of that co-conspirator that he would not have inculpated himself for before. And it's the last part, which is the... I think you can take the statement all the way to that there was a third person. It's the last part where he says that that person was at the Howard County Detention Center without any other identification. There's hundreds of people in the Howard County Detention Center that doesn't actually... You have to look at what a reasonable person in his position would think and whether it would expose him to more liability. And in fact, it seems like, if anything, he's either trying to minimize his liability by pointing to a third unnamed person or that he is trying to protect the third... He's already implicated himself in the act of the robbery and the conspiratorial acts of other people. Now he's implicated himself with the conspiratorial acts of yet a third person. And he can do that without the admission that is inculpatory to my client? Not as a practical matter, but just to follow up on Judge Agee's point, when he started talking about this robbery and about Harvey's role and everything, he was admitting a great deal more knowledge about what was happening in respect to that robbery than an innocent person would normally have. That's... If I were him, and he really wanted... Admitting that you know the people that committed this and everything, you know, it doesn't help you out. But the other point is 804b3 asked whether there's corroborating evidence. And, you know, what is most difficult about your case? And it goes to the 804b3 point, and it also goes to all the harmless error points. But, you know, here you have this texting between Harvey and Dargan about the time of the robbery and what weapons to bring to it. And that's pretty damaging evidence from your point of view. That, you know, you have these people, and this is admitted into evidence, they're saying, you know, they're precisely plotting out the time of the robbery and what guns or knives or whatever should be brought to commit it. And that, you know, that's hard to shake, honestly. If I can respond to that point, our entire defense from opening throughout the entire trial and at closing, and the government acknowledged this in their closing, was that the government had initially arrested the right person, Gary Braxton, and that the wrong person was here. That was, we introduced evidence that Mr. Braxton knew Mr. Harvey through a car accident. It wasn't Mr. Dargan, one of the texters? Yes, Your Honor. The texts that you mentioned involved Mr. Dargan. So how is he in any way a wrong person? Because we were able to introduce evidence that Mr. Braxton was involved in other robberies. The government witnesses admitted they suspected him of other robberies, found of these same watches, found guns in his home that were involved in other robberies, found a backpack in his home that was involved in another robbery. SIRT had pictures of watches at issue in this case on his cell phone. Corroborating evidence, it doesn't say undisputed evidence. I mean, that's always, you're always going to have conflicts, and it's going to go to the weight of the evidence, and the entire fact has to make that determination, which they resolved against your client. And I think on the corroboration point, it goes back to the point that I initially raised, where you have a jailhouse informant, and I'm not able to, my client's not able to respond to the testimony of the jailhouse informant, I'm not able to learn about the relationship between the jailhouse informant and Mr. Harvey, I'm not able to speak to Mr. Harvey or cross-examine him on his testimony. Allowing this type of testimony, where a jailhouse informant can come in and testify as to what a co-defendant told him, where I have no ability to rebut the testimony or cross-examine him. Is that a Bruton argument you're making now? I think that allowing this type of testimony flips Bruton on its head, because I agree that Bruton applies in a situation where Mr. Harvey would be sitting at council table, and his guilt would be at issue. But in that situation, I think under standing Fourth Circuit precedent, the statements about my client would have needed to be redacted. And in that situation, the government would- You have a joint trial here, so what's the authority for that? I think it's the Crawford Confrontation Clause, because I still think there is an open question about whether, especially in a situation like this,  non-testimonial hearsay. You don't have a Bruton argument here? Well, I think Bruton is informative. I think Bruton is informative, because there's a- I agree that this isn't directly on point with Bruton. Mr. Harvey was not sitting here. But just think about the circumstances. If Mr. Harvey was sitting there, the jury would have had to gauge his guilt. And what the court would say in that situation, the district court would say, Government, you have to redact what Mr. Harvey said about Mr. Dargan. That makes sense. How is it, then, that where Mr. Harvey's not there and his guilt is not at issue, that what the statements about Mr. Dargan can come in wholesale? It flips the purpose of Bruton, which is a Confrontation Clause concept to protect the defendant on its head. I see that I have three minutes left, so I just also want to raise the second issue, which is the Plain View Exception issue. I think there's no dispute- the district court was correct that the receipt here did not fall under the search affidavit and the warrant. Why would that be the case? Because the warrant itself encompasses documents related to said crime. And how could they tell whether it was related to said crime unless they looked in the bag? With all due respect to the government, I think that that- in their brief, that that statement was taken out of context. If you look at JA 68, the statement actually reads, and this is in our reply brief, that the people executing the search warrant can search the person and clothing of all occupants and all other persons found in or upon said premises, and then goes on to say that that includes that they may be concealing evidence and or documents relating to said crime. So that's not at issue here. This wasn't a search of a person in the house who may have been concealing documents relating to said crime. In fact, the search warrant included 17 carefully enumerated items, and the receipt here did not fall under any of those items. The district- Why isn't it- I'm sorry? No, you go ahead. Why isn't it an indicia of occupancy? It's not an indicia of occupancy because if you look at the actual receipt, it doesn't have any indicia of occupancy. It said Reggie Racks. It's Reggie Racks. The- Same first name. Same first name, yes. But the attachment actually specifies what includes, although not limited to, indicia of occupancy. It talks about things like utility and telephone bills, canceled envelopes, something that would state his full name and his address. I mean, the concept- It doesn't say that, though. It doesn't say something that would state- I agree, those are certainly stronger indicia of occupancy, but I don't understand why it isn't some indicia of occupancy. I haven't heard that from you. I don't think that the fact that there is the name Reggie on a receipt, but if you look at the receipt, it's at the very bottom. This receipt focuses on a purchase of a belt. It's a typical receipt that you would have if you bought any item. It's not really a typical belt, though. I mean, at least not in my world. And let me quickly address that because I see my time is almost up. The real issue is that the burden here is on the government to prove that a warrantless exception applies. And this morning, the court had an argument where it seemed concerned about speculating on facts. What the district court- The district court made no factual findings in denying the motion to suppress. The plain view requirement requires that the incriminating evidence of the item be immediately apparent. And this is very shortly after a robbery of a jewelry store and where a number of Rolex watches were taken. And then suddenly you see, and this is on the top of a dresser, a Louis Vuitton bag. Now, you know, you don't have to have been in Louis Vuitton. You can look at the bags, and you can look at the French, and you can know that something with a French name in those nice bags. That's high end. And you're going to- So, to someone of common sense, it would say, well, you know, you just had these watches and all the rest, and they're flush with cash. It went into Louis Vuitton. And you'd almost be asking the officers- I mean, these things have a bit of practicality, execution of search warrant. And you'd ask the officers to ignore evidence that could very well be incriminating, and it was. And it's right under their nose. I mean, it's not, you know, under the bed or it's in some corner of a closet or whatever. It's sitting there on the dresser right under their nose. And it's right after the robbery, and it's from a very fancy store. And how they- You can't ask them, you know, just- They would almost be negligent and derelict in their duty had they not at least looked in the bag. And what the Fourth Amendment's concerned about is not having general rummaging, but looking in a bag right sitting there on the top of the dresser is the farthest thing from a general rummaging search that I can imagine. And don't we want to encourage officers to get warrants and not go into houses with warrantless searches and rely on exceptions to the warrant clause for the initial entry? I mean, just- Whatever the angle is here, these people got a warrant. They didn't conduct a general rummaging search. All they did was look in a bag whose incriminating character was- at least suggests itself to me, and find a sales slip, a sales receipt. And, you know, if this is a violation of the Fourth Amendment, we're going to have officers executing search warrants, and you're going to have to put handcuffs on them or something. I mean, handcuffs. This seemed to me so innocuous, quite frankly. May I respond, Your Honor? Sure. The officers could have asked to include in the affidavit evidence of expensive or fancy French purchases. They didn't do so. Moreover, the law does state that the incriminating nature has to be immediately apparent. And the problem in this case- I understand your concerns about officers going into homes and the plain view exception. If they see drugs- the plain view exception, generally, if they see drugs or paraphernalia on a table, that's one thing. In this case, they went and searched in a bag that on its face was not any evidence of a crime. Anyone- I can have a Louis Vuitton bag in my room. Anyone can. They didn't- the problem here is that there is no evidence from the officer, Detective Upton, and in the suppression hearing, his testimony is at JA 131 to 137, about why he seized the bag, how quickly he knew that the incriminating nature was apparent, what- there's no evidence he knew about Mr. Dargan's financial condition, and that a Louis Vuitton bag in his room would have been an unusual thing. And so- The district court found that the incriminating nature of the evidence was apparent? We don't know what the district court found, because the district court heard the argument, said that this was not enumerated in the search warrant, asked for supplemental briefing from the parties on whether the plain view exception applied to this receipt, and then issued an order simply saying that the motion to suppress was denied. So there are no factual findings from the court, and there are no facts in the record when the burden is on the government to prove that the warrantless exception applies, that you can rely on to find that the warrantless exception does apply. I don't think I have much time for rebuttal, but I will try to reserve what I have. You know, there's some very fine advocates, and when that red light comes on, they don't want to hear the next question from the court. Your Honor, my time is up. Zoom. Maybe a lesson learned. Thank you. Mr. Block? Thank you. May it please the court, my name is Benjamin Block, I represent the United States. Let me begin with the last issue that the court was discussing, this issue of whether or not the seizure of the receipt and the bag was authorized under the search warrant. And I think that Judge Keenan is absolutely correct. This is evidence of occupancy. It's not the strongest evidence of occupancy, but it's certainly having a piece of paper which shows a purchase and has the first name of the defendant in a room. It's not necessarily legal residency, but it is occupancy. It links that defendant to that location. And I think that that's significant under the search warrant. With respect... Was the evidence of occupancy, I mean, are we talking about before they looked in the bag or after they looked in the bag? After they looked in the bag, Your Honor. And they were... Shouldn't we look at it before they looked in the bag? As to whether something is evidence of occupancy, or rather than trying to sort of say it's so after the fact? Well, you can't determine whether or not something is evidence of occupancy until you've had a chance to look at it. And they were certainly... I'm just curious, but why would they think that there was evidence of occupancy within the bag? Well, they didn't have to look in the bag specifically for evidence of occupancy. They had the authority to look in the bag for other items that were authorized by the search warrant. They were authorized to look for ammunition, knives, cell phones, watches, and various forms of paperwork, all of which could have been contained in the bag. So they certainly had the authority... I'll take it to plain view. I'm sorry? I'll take it to plain view. While they were looking in the bag for all this other stuff, there's the receipt. It certainly takes you to plain view for purposes of otherwise incriminating evidence. But simply with respect to indicia of occupancy, all you have to do is have legal authority to look somewhere. And then when you look, if it shows indicia of occupancy, that is something that's specifically authorized by the search warrant. But certainly, once you step back to plain view, their authority to search and to seize that item becomes even more apparent. They... Wouldn't the... Wouldn't from the standpoint of the plain view exception... Wouldn't the bag itself suggest incriminating evidence? Absolutely, Your Honor. This is... And that's... Go ahead. Certainly, as Your Honor noted, this is an extremely high-end store. There was not testimony in the motions hearing regarding the condition of the home or the neighborhood, but this is an extremely poor area of Baltimore where this search occurred. And for a detective conducting a robbery investigation in which high-end watches were stolen, to then see other high-end, not goods, but a bag from another high-end store, it certainly suggests that that person had an influx of cash. And that... So the bag itself... It was approximately three... A little more than two months, less than three months after the robbery. However, once they... And they had authority to look at the paper because the warrant authorized them to look for certain types of paperwork. Occupancy, residency, paperwork for firearms, notes. So they have the authority to look at the paper to determine whether it's something that meets the items indicated in the warrant. And once they do that, the incriminating nature of that receipt becomes immediately obvious. Your analysis doesn't really require any reliance on the high-end nature of that bag, does it? Absolutely not. Let me just say the reason why it concerns me. It just concerns me. I understand that it's atypical to find a high-end purchase in a poor place, but it would suggest perhaps a different standard. You know, that if you find it in a rich person's house, it's not fair game to look at it. Whereas if you find it in a poor person's house, it is fair game to look at it. And it seems to me that you don't have to even go there in your analysis. So, I mean, I just want to make clear you're not relying on that. No, I completely agree. I think that they had authority... Exactly. There was contraband authorized by the warrant that permitted them to look in that bag to see whether it was contained there. There was authority under the warrant to look at different types of paperwork to determine whether it was authorized by the warrant. Once they have the authority to look at a piece of paper, as Judge Wilkinson said, you're essentially asking them to ignore the contents of the document, no matter how incriminating it is. And this document was certainly incriminating. It was dated the day after the robbery, and the detectives executing the search were the primary investigators of the robbery. They knew the date of the robbery, and they knew that the receipt indicated it was purchased in cash. Regardless, if the bag had said Kmart, they would have the same authority. If it said Kmart, if it said Target, Marshalls, any bag that could have contained guns, knives, ammunition, watches. A bag that had nothing on it, a plain brown paper bag. Exactly. Exactly. And I don't think that the incriminating nature of this document is in dispute. What Mr. Dargan wants you to believe is that a detective is not capable of looking at a piece of paper and immediately noticing a date, the fact that it was paid in cash, the fact that it bore the first name of the defendant. And that's simply not, it's nonsense, frankly. A detective who's intimately familiar with this investigation. The sales receipt was inside the bag. Correct. There was no, part of it wasn't poking out or whatever. That particular detail wasn't explored during the motions hearing, but because they had the authority to look at paperwork for other purposes. Sometimes it's good to step back on these things a bit and sort of see the, make sure you see the forest and don't get lost in the trees. For me, the forest is, they got a warrant. They were careful about that. And looking in the bag, I mean, it's the kind of police conduct you want to encourage. And looking in the bag strikes me as a whole lot different from tearing out somebody's drawers and opening the drawers of the dresser and just going through somebody's undergarments and going into their closet and looking here and there. It just wasn't, looking in the bag just isn't the kind of really intrusive step. I mean, privacy interests are at the heart of the Fourth Amendment. I suspect if you're leaving a bag on top of a dresser, you have less of a privacy interest than you do if you have some sort of box containing family heirlooms or whatever inside your dresser drawer. It doesn't strike me that these people tore the place up. No, and frankly, it's far less of an invasion of privacy than was condoned by this court in Crouch where they looked into opened envelopes of mail and pulled out personal correspondence and reviewed personal correspondence. And that was deemed appropriate under plain view. Isn't really your position in this case the police wouldn't have been doing their job if they hadn't opened the bag? Correct, correct. They were compelled by the nature of the items they were searching for to look in that bag, and having done so and having properly looked at the receipt, it would have been, as Your Honor said, negligence to leave it behind. Turning to, unless there are further questions on that issue, turning to the issue of the co-conspirator statements, it's hard to look at the case law following Crawford and find a way that non-testimonial statements such as these were subject to the Confrontation Clause. The case law following Crawford, particularly Wharton v. Bochting, where a unanimous court says Crawford excludes non-testimonial statements from the protection of the Confrontation Clause, it doesn't leave a lot of wiggle room. And to the extent that there is wiggle room, it's not present in this case. You know, a statement made in a prison cell, with all the difference in the world between that and a statement made at a police station, where you're making the statement to another private citizen, much less likely to be testimonial than when you are in a police station giving evidence to the state, giving evidence in return for some sort of break in your sentence or trying to maneuver cooperation to your advantage. I've always thought that exchanges between private citizens were in a totally different category from cooperation with law enforcement, just in terms of testimonial things, in that the way you tried to test those reliability, the reliability of exchanges between private citizens were simply through the federal rules of evidence and the checks that they put on the admission of hearsay evidence. Correct. And he said, well, the rules of 804b3, the elements are just not met here, because I don't think this is a statement against interest on Harvey's part. What do you think? I think that, first of all, the standard for the court in looking at that question is abuse of discretion. Did Judge Blake abuse her discretion in finding that these statements were against penal interest? And I think there is no question that there is no abuse of discretion here. The two statements out of everything Harvey said that Mr. Dargan contests is the fact that there was a third co-conspirator, and that third co-conspirator was incarcerated at Howard County Detention Center. Those two statements, particularly when taken in context with the remainder of Mr. Harvey's statements, are clearly incriminating. They provide details of the crime, the number of people who participated. They link Mr. Harvey to the conduct of those other individuals. And to suggest that the identifying information about Mr. Dargan, which wasn't his name, but rather his location, is not incriminating as to Mr. Harvey ignores the nature of the discussion that was going on between Mr. Schanenberger and Mr. Harvey. Mr. Harvey was putting himself squarely in the middle of an armed robbery that resulted in the loss of more than $250,000 worth of watches. And he wasn't putting the blame on anyone else. He was saying, I did it with this guy, I did it with this guy. And for him to be able to identify specifically who else was involved and where they were located shows his intimate knowledge of the members of the conspiracy and the crime itself. So for those reasons, the government views these statements as highly inculpatory as to Mr. Harvey. In terms of the corroborating evidence that 804B requires for the trustworthiness of a statement where Harvey's unavailable to testify, Harvey, this texting between Harvey and Dargan on the morning of the robbery, they talk about, they time it for each other. Dargan says, let's do it at 11 o'clock. And then Harvey says, get dressed, we're on the way. And then Harvey tells Dargan what weapon to bring. He says, bring the knife. And then all of a sudden, communication between the two falls silent. And lo and behold, the silence is during the time that the robbery is being committed and the getaway is being executed and that they are in one another's presence so they don't need to text. That's not good evidence for Mr. Dargan. I think the jury agreed with you. It's not good evidence for him. And it's corroborated not only by the texting, which is extraordinarily incriminating, two different witnesses came in and identified Mr. Dargan personally in the photos of the robbery, one of whom was a relative, essentially, who had no incentive to testify whatsoever. You also had cell phone evidence that showed Mr. Harvey and Mr. Dargan in the vicinity of the mall a few days before the robbery, and the owner of the store said that two of the individuals from the robbery were in the store several days prior, although he couldn't specifically identify who they were. From Mr. Dargan's point of view, it's kind of a tough case, isn't it? I think it's a tough case. As a prosecutor, you'd love to have this embarrassment of riches in all your cases, wouldn't you? I felt good about our chances at trial. And I think that for those reasons that the court's pointing out, this is no more... I mean, even if the court were to get there, this is as harmless as harmless error can be. The identifications, the text messages, the cell phone evidence, we're talking about minor details, such as the fact that he had an expensive belt afterwards and where he happened to be located at a particular time. These are minor, minor details in the context of a trial that involved direct identifications and other extraordinarily incriminating evidence. So for those reasons, we would ask the court to affirm the conviction. Barbara, any questions? Thank you, sir. Thank you very much. Come on, let us have your rebuttal testimony, Mr. Steklov. Thank you, Your Honor. With respect to the receipt, I don't dispute that the officers had the right to look in the bag, and I agree that whether it was a Louis Vuitton bag or a brown bag, they could look in that bag. What they could look in that bag for were items that were enumerated in the search warrant. So they could look for weapons, they could look for watches. And I actually agree they would have been derelict in their duties had they not looked in the bag. But the problem with the record in this case is that once they looked in the bag, if you agree that it wasn't an indicia of occupancy, the government has the burden to prove that it fell under the point of view exception, and the government has to prove that the incriminating nature of the receipt was immediately apparent. And we can speculate about how easy it was for the officer who grabbed that receipt to have known that the incriminating nature was immediately apparent, but it's not in the record, because the government didn't elicit that testimony at the motion to suppress hearing or at trial. And so we don't know... So though, why wouldn't this be harmless error in the face of all the evidence in this case? I want to address the harmless error point. With respect to the belt, the government had no evidence of direct profit from the robbery of tens of thousands of dollars. The client took of himself on a cell phone holding up a wad of cash right after the robbery. And yet they chose to emphasize the belt. In their closing argument, they stood about the belt. They said that that's what this brazen behavior was about. They passed the belt around to the jury. They took the time to bring in the Louis Vuitton store clerk and played a 10- to 20-minute video of my client buying the belt. And so they not only introduced the receipt, but they emphasized that throughout the trial they brought in the store clerk and they brought in the belt because they felt it was necessary to prove their case. And with respect to Mr. Schanenberger and the harmless error on that question, our defense was that it was possible that Mr. Dargan traveled down to the mall, but that Mr. Braxton, who had all of this evidence of watches, stolen watches, selling stolen watches, searching on his phone about the robbery, that he may have been the one that went in the store and executed the robbery and was the third person. And the evidence that they used in closing and the evidence that they emphasized to establish that it wasn't Mr. Braxton, but instead was Mr. Dargan, was the hearsay testimony of Mr. Harvey. Was his name Braxton? Was he texting with Harvey before the robbery? He was not texting with Harvey immediately before the robbery.  But we introduced phone calls around the robbery that Mr. Braxton and Mr. Harvey were engaged in and a plethora of evidence of Mr. Braxton's involvement. Did Mr. Dargan testify? No, he did not. He didn't testify? No, he did not, Your Honor. He has every right not to testify, but sometimes it's just as a matter of trial strategy, a good thing to put someone on the stand. Juries, people have a perfect right not to say a word, obviously, that's basic. But on the other hand, juries have a perfect right to wonder why they're not there. I actually think under the instructions they're not allowed to speculate about why they're not there because it would be asserting their Fifth Amendment right against them. And so the court instructs the jury not to take into consideration in any way why they did or did not testify. And I think I emphasized that during my closing argument. I understand, but sometimes people can testify and some people find them credible. And had Mr. Dargan chose to testify, I don't know what the outcome would have been, but he chose not to testify, and I don't... It really is a perfect right. I think that's correct, but I think that just to go back to this point about the jailhouse informant, it's actually, I think, interesting that Mr. Harvey, you know, if he gives a videotaped confession to police officers that a jury can see, where he concedes the crime, points the finger at Mr. Dargan, that that can't come in because we have confrontational concerns. But then where a statement is allegedly made in a jail cell, there's no videotape of it, there's nothing to corroborate, and I can't, I don't have the ability to talk to Mr. Harvey about what happened between Mr. Harvey and Mr. Shannenberger. I don't have the ability to call Mr. Harvey on the stand because he's going to assert his Fifth Amendment right and he's unavailable, and have him respond about whether he made those statements that that can come in. And I think that the court should consider the implications of allowing this, even though it is non-testimonial, allowing this type of testimony in on an ad hoc basis with no restrictions on what the government can introduce against a defendant sitting at trial. And that's the final point that I would like this court to consider on that issue. Post-Bruton, didn't the Richardson case place a good deal of emphasis on whether the declarants, in this case Harvey's testimony, referred to the defendant by name? I think that the law is clear that there can be, I mean, the government was very clear that this was specifically referencing Mr. Dargan. Well, I mean, that's often the case, but, I mean, I thought Richardson, you can refresh my recollection about it, but I thought Richardson said that where the non-testifying co-defendant or the non-testifying declarant didn't mention Mr. Dargan by name, that that went a long way to undercutting any charges or Bruton violations. I think it's a consideration. I think, obviously, if the specific name is mentioned, there's a higher Bruton concern, but I think even under Richardson, it depends on the circumstances. Because if he just says, it was a friend, that's one thing. But here the government was able to show that Mr. Dargan was in the Howard County Detention Center when the statements were made, and Mr. Braxton, again, our entire defense, was not in the Howard County Detention Center. And that's why that evidence wasn't harmless error, and that's why the evidence was significant. Thank you. I see, Mr. Steckloff, that you're also court-appointed, and I think you've done a very fine job, and just want to thank you. Thank you, Your Honor. We never thank the U.S. attorneys or the public defenders, but sometimes the U.S. attorneys and the defenders are worthy of an expression of thanks, too. So let's come down and say hi, and we'll get through our final case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Barbara Milano Keenan